## Fort Worth & Denver City Railway Company et al. v. State of Texas.

### No. 1412.   Decided May 18, 1905.

**1.—Antitrust Law—Railway—Sleeping Car Company.**

A contract between a railway and a sleeping car company for the exclusive operation of the sleeping cars of the latter upon passenger trains over the lines of the former for the term of fifteen years, was not violative of section 1 of the Antitrust Law of March 31, 1903 (Acts, 28th, Leg. p. 119), where it did not fix the cost of transportation on such cars, leaving same to be fixed and to be changed at will by the sleeping car company, with the restriction only that it should not exceed the charges made for such service on the lines of competing roads, and where there was no pooling or combination of rates, but each company fixed the charges for its respective service.   (Pp. 42, 43.)

**2.—Same.**

A contract by which the railway paid mileage to the sleeping car company on the cars run over its road where the annual revenue per car to the latter company from its charges failed to reach a fixed sum had no tendency to affect the cost of transportation by increasing the rates charged by such sleeping car company for its service.   (P. 43.)

**3.—Same—Restrictions on Freedom of Business.**

Such contract did not create or carry out a restriction in the free pursuit of business authorized by the laws of the State; the railway could discharge its duties to the public in the matter of sleeping cars either by furnishing its own coaches or contracting with another to furnish them; and could make such contract exclusive because no other person or corporation had a right to demand that its sleeping cars should be attached to the passenger trains of the railway to be violated by such exclusive contract.   (Pp. 43-45.)

**4.—Same—Monopoly.**

A contract between a railway and a sleeping car company giving the latter the exclusive right to operate sleeping cars in connection with passenger trains on the road, does not constitute a monopoly such as is prohibited by section 2 of the Antitrust Law of 1903, as the term is there defined; it neither brought the direction of the affairs of the two corporations under one management or control, nor did one acquire thereby, the shares, etc., or physical properties of the other.   (Pp. 45, 46.)

Questions certified from the Court of Civil Appeals for the Third District, in an appeal from Travis County.

*Stanley, Spoonts & Thompson,* for appellant, Ft. Worth & Denver City Railway.—Independent of the Act of 1903 of the Texas Legislature, commonly known as the antitrust statute, the contract between the defendant railway company and the Pullman Company was a valid and binding contract, not against public policy, and not at all in restraint of trade or commerce. The Express Cases, 117 U. S., 1; The Pullman Cases, 139 U. S., 89; Donovan v. Railway Co., 120 Fed. Rep., 215; Cole v. Rowen, 13 Law. Rep. Ann., 848; Atlantic Exp. Co. v. Railway Co., 18 Law. Rep. Ann., 393; Barney v. Steamship Co., 67 N. Y. 301; Fluker v. Railway Co., 2 Law. Rep. Ann., 843; Kates v. Baggage Co., 16 Am. & Eng. R. R. Cases (N. S.), 140; Lewis v. Railway Co., 81 S. W. Rep., 111.

The contract between the Pullman Company and the railway company is not in conflict with the Act of 1903, and the making or carrying out of said contract would not violate any of the provisions of said law.

The agreement between the Pullman Company and the railway company does not create a trust, a monopoly nor a conspiracy in restraint of trade as prohibited by the Act of 1903.

In order for a trust to be created under the Act of 1903 there must be a *combination* of capital, skill or acts, and the contract between the defendant companies does not create a combination. A combination is a union,—a joining of two or more factors into one result; a blending by which the original separate identity is merged into a result in which each of the original factors or parties have a common and not a separate interest. A contract may create a combination if it brings about a union of interest, but if it does not, and if each party is contracting at arm's length and seeking to secure the best results, and if after the contract is made the interest of each party in the performance of the contract is separate, no combination will be created and no trust formed.

A monopoly under the Act of 1903 is a combination or consolidation of two or more corporations so as to bring them under the same control and create a trust as defined in said Act, or when one corporation acquires control of the stock of another so as to lessen or destroy competition.

A conspiracy in restraint of trade, under said Act of 1903, results when parties engaged in buying and selling agree to refuse to buy or sell to some other person, or when they boycott some other person.

Before any contract will create a trust, it must be mutual and obligate each party thereto to grant to the other party rights that are exclusive. If the Pullman Company had obligated itself not to furnish cars to any other railway company and the railway company had bound itself to lease cars from no other company than the Pullman Company, the contract might be injurious to the public and unreasonable; but, in the absence of such mutual covenants, the obligation is unilateral and fails to create any combination.

It is not contended that the railway company can not lawfully lease cars from the Pullman Company. If, by reason of the Act of 1903, the exclusive feature of the contract became unlawful, the contract will be treated as divisible, and those provisions thereof which are not in conflict with the law will be binding, and those in conflict will be held to have been annulled. Queen Ins. Co. v. State, 86 Texas, 250; Gates v. Hooper, 90 Texas, 563; State v. Shipper's Compress Co., 95 Texas, 613; 25 Am. & Eng. Enc. Law (2d ed.), 1110; Lemon v. Pullman, 52 Fed. Rep., 262.

*Andrews, Ball & Streetmann* and *J. D. Guinn,* for appellant, Pullman Company.—The contract in question was not a violation of the antitrust law of 1903, because the Pullman Co. was not a competitor of the R. R. Co. and the R. R. Co. giving it the exclusive privilege to furnish cars over its line and connect with its train, it merely operated a part of its own business through the instrumentality which the R. R. Co. had the right to select. Welch v. Windmill Co., 89 Texas, 655; Gates v. Hooper, 90 Texas, 565; Lewis v. Railway Co., 81 S. W. Rep., 111; Express Co. Cases, 117 U. S., 1; Wiggins Ferry Co. v. Railway Co., 27 S. W. Rep., 570; Donovan v. Railway Co., 120 Fed. Rep., 215; Barney v. Steamship Co., 67 N. Y., 301; Kates v. Baggage Co., 16 Am.

& Eng. Ry. Cases (N. S.), 140; Pullman Palace Car Cases, 139 U. S., 89; U. S. v. Freight Assn., 166 U. S., 541; Hopkins v. U. S., 171 U. S., 578; U. S. v. W. A. Council, 26 Law. Rep., Ann., 158; Addyston P. & S. Co. v. U. S., 175 U. S., 211; State v. Compress Co., 95 Texas, 603.

The contract in question is not a *"combination"* as defined in the acts of 1903 and the petition therefore fails to state the violation of the terms of that statute.

*C. K. Bell,* Attorney-General, *Jno. W. Brady,* County Attorney, *D. A. McFall* and *Allen & Hart,* for appellee.—The allegations of plaintiff's second amended petition were sufficient to bring the case within the scope of the Act of 1903, and the proof was ample to sustain the judgment rendered by the court under said act. Plaintiff's cause of action was complete upon such pleading and proof and it was not incumbent upon plaintiff to show specifically that the exclusive provisions of the contract complained of had been enforced by showing that there were other competing sleeping car companies, or that other sleeping car companies applied to the railroad company to be allowed to furnish .sleeping cars to it, nor is it any excuse to say that the contract did not bind the Pullman Company not to lease sleeping cars to other railroads. Bill of Rights, State of Texas, sec. 26; City of Brenham v. Brenham Water Co., 67 Texas, 561; Texas & P. Co. v. Lawson, 89 Texas, 394; Waters-Pierce Oil Co. v. State, 19 Texas Civ. App., 1; United States v. Trans-Missouri Freight Assn., 166 U. S. 290; United States v. Joint Traffic Assn., 171 U. S. 505; Texas & P. Ry. Co. v. Southern P. Ry. Co., 41 La. Ann., 970; Criminal Code, arts. 15, 16, 17; Gulf C. & S. F. Ry. Co. v. State, 72 Texas, 404; Const., sec. 5, art. 10; secs. 1, 2, 3 and 5, art. 12; Chicago Gas L. and C. Co. v. Gas Light Co., 121 Illinois, 530; State v. Fireman's Fund Ins. Co., 52 S. W. Rep., 595; the People v. North River Sugar Refining Co., 5 Law. Rep., Ann., 386, same case, 2 Law. Rep., Ann., 33; Judd v. Harrington, 139 N. Y., 105; State v. Standard Oil Co., 49 O. State, 137; Arnot v. Pittston Coal Co., 68 N. Y. 559; Kettle River Ry. Co. v. Eastern R. R. Co., 6 Law. Rep., Ann., 111; Diamond Glue Co. v. Glue Co., 187 U. S., 611.

BROWN, ASSOCIATE JUSTICE.—This is a certified question from the Court of Civil Appeals of the Third Supreme Judicial District. The statement and questions are as follows:

"The Court of Civil Appeals of the Third Supreme Judicial District certifies that the above styled and numbered cause is now pending and undecided in this court, wherein the State of Texas was plaintiff in the court below, in a suit against the defendants, the Fort Worth & Denver City Railway Company and the Pullman Palace Car Company, to recover penalties for a violation of the antitrust laws of 1899, and the antitrust statute of 1903.

"The case was tried before the court without a jury, and the trial court concluded that there had been no violation of the antitrust law of 1899, but that there was a violation of the antitrust statute of

1903, and assessed a penalty against each of the defendant corporations in the sum of $18,550.

"The findings of fact of the trial court, which we adopt and approve, are as follows:

" 'First. The Fort Worth & Denver City Railway Company is a railway corporation, chartered by a special act of the Legislature, approved May 26, 1873, which said Act is hereby made a part of this statement of facts, and acting under said charter the said company's railway line was constructed and since its construction has been in operation, and during said time it has operated a line of railway, and still operates a line of railway, from Fort Worth, in Tarrant County, Texas, to Texline, in Dallam County, Texas. The Pullman Company is a corporation organized, chartered and doing business under and by authority of the laws of the State of Illinois.

" 'Second. That on the 1st day of February, 1899, or the 13th day of March, 1899, the Fort Worth & Denver City Railway Company and the Pullman Palace Car Company made and entered into a contract, such contract being signed in the city of Chicago, Ill., by the vice-president and secretary of said Pullman Palace Car Company, and signed in the city of Denver, Colorado, by the president of the Fort Worth & Denver City Railway Company, and was attested and the seal of the Fort Worth & Denver City Railway Company affixed thereto by the secretary of said last named company at Forth Worth, Texas, and such contract is as follows:

" 'This agreement, made the 1st day of February, A. D. 1899, between Pullman's Palace Car Company, hereinafter called Pullman Company, party of the one part, and the Fort Worth & Denver City Railway Company, hereinafter called the Railway Company, party of the other part witnesseth:

" 'Whereas, on the 1st day of March, A. D. 1888, a contract was made between the Pullman Company and the Railway Company, in pursuance of which the sleeping cars of the Pullman Company were to be operated over the lines of the Railway Company for a period of fifteen years from the 1st day of March, A. D. 1888; and

" 'Whereas, the Railway Company desires to terminate said contract for the purpose of entering into a new contract, and the Pullman Company is willing to enter into such new contract.

" 'Now, therefore, in consideration of the premises and of the agreements hereinafter contained, the said contract is terminated between the parties hereto, and they agree as follows:

" 'Article I.

" 'Section 1. The Pullman Company shall furnish sleeping cars, properly equipped and acceptable to the Railway Company, sufficient in the judgment of the general manager or superintendent of the Railway Company, to meet the requirements of travel over the lines of railroads now owned or controlled by the Railway Company, and over all additional railroads which it shall hereafter own or control.

" 'Section 2. The Pullman Company remaining the owner of all the sleeping cars furnished hereunder, and maintaining the same except as herein provided, shall have the right to collect such fares from railroad

passengers occupying such cars for the use of seats and berths therein, as are customary on competing lines of railroads where equal sleeping car accommodations are furnished; no more room in said sleeping cars shall be furnished to any person or persons than is usually furnished to passengers by railroad companies which use their own sleeping cars, unless by the assent of the proper officers of the Railway Company.

" 'Section 3. The Pullman Company shall furnish with each of such sleeping cars one or more employes, as may be necessary, whose duties shall be to collect fares from railroad passengers, occupying said cars, for the use of seats or berths therein, and generally to wait upon and provide for the comfort of passengers therein; such employes at all times shall be subject to the rules of the railway company governing its own employes.

" 'Section 4. The Pullman Company, except as hereinafter provided, shall keep all such sleeping cars in good order and repair and shall renew and improve the same so far as may be necessary to keep them up to the average standard of approved sleeping cars furnished by the Pullman Company for general use on competing lines.

" 'Section 5. The Pullman Company shall save harmless the Railway Company from damages, costs and expenses, growing out of, or incident to, any claim that may be made to the effect that any of such sleeping cars or any part thereof, or any improvements therein or thereon, is an infringement upon Letters Patent of the United States covering like cars, or like parts thereof, or like improvements thereon or therein; provided the Railway Company shall first give the Pullman Company written notice of any such claim, when made, in order that it may resist the same should it desire to do so.

" 'Section 6. The Pullman Company will place its tickets for seats and berths on sale in such of the railroad ticket offices as either party may consider necessary for the convenience and accommodation of passengers.

" 'Section 7. The Pullman Company shall furnish free passes to the general and division officers of the railway company, for use in said sleeping cars, over the lines of railroad now owned or controlled by the railway company, and over any additional railroads which it may hereafter own or control.

" 'ARTICLE II.

" 'Section 1. The Railway Company shall haul all said sleeping cars furnished by the Pullman Company hereunder that may at any time be necessary in operating the lines of railroad now owned or controlled by the Railway Company, and any additional railroads which it shall hereafter own or control; and shall use such cars as a part of all passenger trains controlled, in whole or in part, by it, where sleeping cars are required, in such manner as shall best accommodate passenger travel.

" 'The Railway Company shall also, in consideration of the use of said sleeping cars for the transportation of its passengers, bear the cost of maintaining the running gear and bodies of such cars, and other parts thereof as are essential to ordinary first-class passenger cars,

and are not incidental to a sleeping car, which cost is understood and agreed to amount to an average of two cents per mile run, and shall, except as hereinafter provided, pay to the Pullman Company, in satisfaction of such obligation, two cents per car per mile for every mile run by said sleeping cars upon the roads of the railway company, or upon the roads of other railroad companies by direction of the officer of the Railway Company.

" 'The Railway Company shall pay one cent per car per mile for every mile run by tourist or second-class sleeping cars furnished under this contract.

" 'Section 2. The Railway Company shall haul, without charge to the Pullman Company, said sleeping cars to and from repair shops, and to and from other points on the lines of railroads at any time owned or controlled by it, as may be necessary in order that such sleeping cars may be put in good order and repair or be renewed or improved as required hereunder. No mileage shall be paid on the cars so hauled.

" 'Section 3. The Railway Company shall furnish and apply to said sleeping cars all necessary lubricating material, ice and water, fuel for heating, and oil, fluids or other proper material for lighting; and shall wash and clean said cars; and shall replace bell cords and couplings and air-brake hose and couplings, as often as necessary.

" 'Section 4. The Railway Company shall pay to the Pullman Company the cost of repairing and making good all damages to any of its sleeping cars resulting from accident or casualty on the lines of its roads, or on any other roads upon which any of said cars may be run by direction of the Railway Company, except damages resulting from accident or casualty arising from defective heating or lighting apparatus, or from the actual negligence of the employes of the Pullman Company in the line of their employment.

" 'Section 5. The Railway Company shall promptly make all such repairs as may be necessary to put any of said sleeping cars in good order, whenever requested by the Pullman Company so to do; and shall, without request, make such repairs as may be required at any time to insure the safety of said cars, and when the Pullman Company is, by the terms hereof, under obligation to make such repairs, shall, at the end of each month, render to the Pullman Company bills therefor, charging the actual cost of material and labor expended on such repairs, with an addition of ten percent to cover general expenses.

" 'Section 6. The Railway Company shall furnish, free of charge at convenient points, rooms and necessary facilities for airing and storing bedding, linen, supplies and other moveables belonging to or designed for the use of said sleeping cars.

" 'Section 7. The Railway Company shall require its ticket agents, at such offices as may be designated by either party, to sell tickets for seats and berths in said sleeping cars, without charge to the Pullman Company; the proceeds of such sales to be at the risk of the Pullman Company.

" 'Section 8. The Railway Company shall furnish free passes to the general and division officers of the Pullman Company, over the lines of

railroads now owned or controlled by the Railway Company, and over any additional railroads, which it shall hereafter own or control.

## 'ARTICLE III.

" 'Section 1. All settlements and payments for mileage and repairs shall be made monthly between the parties hereto; subject, however, to adjustment at the close of each contract year on the following basis:

" 'Whenever the revenue from the sales of seats and berths on any line shall be at a rate less than five thousand dollars per car per annum, on all the cars employed upon such lines, the Railway Company shall pay two cents per car per mile run by the cars on such line.

" 'Whenever such revenue upon any line shall be at a rate of five thousand dollars or more, but less than six thousand dollars per car per annum, on all the cars employed upon such line, the Railway Company shall pay one cent per car per mile run by the cars on such line.

" 'Whenever such revenue upon any lines shall be at a rate six thousand dollars or more per car per annum, on all the cars employed on such line, the Railway Company shall not pay any mileage on the cars on such line.

" 'If any line shall be operated for a fraction of a year, then the mileage payable by the Railway Company on such cars shall be adjusted at the rate per mile run which would be payable thereon continued during the entire year at the same rate during the entire year as during the period of such employment.

" 'Whenever such revenue equals or exceeds an average of six thousand dollars per car per annum from the whole number of cars furnished, the Railway Company shall not pay any mileage on such cars.

" 'In determining the number of cars furnished, and the rate of revenue per car per annum, upon any line or upon all lines, twenty percentum shall be added to actual days' service of such cars in order to cover shoppage and idle time of cars.

" 'Section 2. The Railway Company shall have the right to cooperate with other railroad companies in forming through and continuous lines of sleeping car service; and if it should become necessary for the Railway Company so to cooperate with other railroad companies using sleeping cars not owned by the Pullman Company, the Pullman Company shall have the right to furnish its pro rata of sleeping cars, for services on such through or continuous lines, based upon the mileage of the Railway Company in said lines; and in all cars operated on such through or continuous lines the Pullman Company shall be entitled to receive all local fares for the use of seats and berths therein upon the roads of the Railway Company, and its mileage proportion of through and intermediate fares.

" 'Section 3. If any of the Pullman Company's employes furnished with any of the sleeping cars operated under this agreement, should be injured or killed in consequence of a railroad accident, or casualty, when serving in the line of his duties, the Railway Company shall save harmless the Pullman Company from damages, costs and expenses growing out of or incident to such injury or death, to the extent that the Railway Company would be liable if such employe were in fact an em-

ploye of the Railway Company when so injured or killed, and the Pullman Company shall save harmless the Railway Company from such damages, costs and expenses to any greater extent; each party to have immediate notice from the other of any claim or suit for such injury or death, and the right to resist or defend such claim or suit.

" 'Section 4. If either of the parties hereto shall fail to clean or repair, according to its obligation under this agreement, any of said sleeping cars, and shall, after written notice from the other party of the neglect complained of, further neglect or refuse to so clean or repair said sleeping cars within a reasonable time, such other party shall have the right to clean said cars and to make or cause to be made all necessary repairs and renewals thereof, and shall, at the next monthly settlement between the parties, be repaid the cost of such portion of the cleaning or repairs as the party in fault is liable for by the terms of this contract.

" 'Section 5. If either of the parties hereto shall fail to keep or perform any of its agreements hereunder, and shall continue in default for sixty days after written notice of such failure from the other party, then such other party shall have the right to declare this agreement terminated at such time as shall be specified by written notice of its intention to terminate the same.

" 'Section 6. This agreement shall be construed liberally, so as to secure to each party all the rights, privileges and benefits herein provided or manifestly intended, and if any difference between the parties shall arise which can not be amicably adjusted by and between the parties, it may be submitted to referees, one to be appointed by the Railway Company, and one by the Pullman Company, the two, in case of disagreement, to appoint a third; the decision of two of them to be final.

" 'Section 7. The Pullman Company shall have the exclusive right during the continuance of this agreement, to furnish all sleeping cars for use on all the lines of railroads now owned or in any way controlled by the railway company, including branches and bridges, and on all the additional railroads which it shall hereafter own or in any way control; and also on all passenger trains on which it may, by virtue of contracts or running arrangements with person, companies or corporations owning or controlling other lines of railroad, have the right to use such cars; and the Railway Company, except as provided in Section 2 of this article, shall not contract with any other person, company or corporation to run any sleeping cars on or over any of the lines of railroads aforesaid during the said period.

" 'Section 8. This agreement shall take effect February 1, A. D. 1899, and shall remain in force for the full term of fifteen years from the date hereof, subject to the right of either party, at its option, to terminate the same on the 1st day of February, A. D. 1909, by giving notice in writing to the other party of its intention to do so at least six months before the date last named; unless the same shall be sooner terminated by virtue of the provisions of section 5 or article 3 of this agreement, or by the mutual agreement of the parties hereto.

" 'In witness whereof, the parties hereto have signed, sealed and delivered these presents, the day and year first herein written.

" 'PULLMAN'S PALACE CAR COMPANY,
" '*Attest:*                    " 'by T. H. Wickes, Vice-President.
" 'A. M. WEIMSHEINER, Secretary.

" 'THE FORT WORTH & DENVER CITY RAILWAY COMPANY,
" '*Attest:*           .           " 'by Frank Trumbull, President.
" 'GEO. STRONG, Secretary.

" 'Signed at Denver, Colo., March 13, 1899.

" 'That since the execution of said contract continuously up to the time of the trial of this case, sleeping cars have been operated by the defendants under said contract.' "

We omit the facts certified which are irrelevant to the questions under our view of the law.

The Court of Civil Appeals certified these questions:

"I. Is the contract in question, as set out in the findings of fact, executed between the Railway Company and the Pullman Company, in view of the facts as stated, in violation of any provision of the first section of the antitrust statute of March 31, 1903, page 119 of the Session Laws of the 28th Legislature?

"II. Does such contract, in view of the facts, constitute a monopoly within the meaning of section 2 of said antitrust statute, or is its tendency to create a monopoly within the meaning of that section?"

The acts forbidden by the law of 1903 are so numerous that we will not undertake an examination of each one separately in this opinion. We have carefully examined the entire Act and each specification in reference to its application to the facts of this case and we are of the opinion that the following are the only provisions of the Act which have a semblance of applicability to this contract:

First. To fix or maintain any standard or figure whereby the cost of transportation shall be in any manner affected or established.

Second. To make any contract by which they shall agree to keep the cost of transportation at a fixed or graded figure, or by which they shall in any manner affect or maintain the cost of transportation or by which they shall agree to pool, combine or unite any interest they may have in connection with any charge for transportation.

Third. To create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this State.

Without so deciding, we will, for the purposes of this opinion, assume that the facts of the case show a combination between the corporations named, and that the word "transportation" as it occurs in the Act embraces carriage of both passengers and freight. The first inquiry that we shall address ourselves to is, do the facts and the contract set out in the statement upon which the questions are submitted, show that the law has been violated by the corporations through any interference with transportation of passengers. The only reference in the contract to any charges to be made by either company is the stipulation that the Pullman Company should not charge passengers in its cars on the line

of the Ft. Worth & Denver City Railroad Company more than it charged on the lines of competing railroads. The contract did not require that the charges should be maintained as they were then fixed, nor did it fix any standard of charges by which either company should be governed. No pooling or combining of rates between the said companies was provided for, but each was at liberty to prescribe its own charges and to change them at its pleasure. Neither corporation was entitled to receive any part of the charges made by the other; in fact, there was no semblance of a pooling or combination of rates, nor is there anything in the contract by which it would be possible to hold that the making, maintaining or charging of rates by either company, or by any other company, corporation or person, would be in the least affected, or could possibly be affected.

Counsel for the State contend that the provisions of the contract by which the mileage to be paid by the railroad company for the use of the sleeping cars was to be regulated by the average amount received from each sleeping car, so that in case the collection on each car should exceed $6000 a year, no mileage should be paid by the railroad company, had a tendency to increase the rates charged on the sleeping cars in order to reach the maximum revenue of each car. Certainly this could not have been an inducement to the Pullman Company to increase its charges, because by increasing its rates and the revenue from each car, it would lose the mileage to be paid by the railroad company; for although its increased revenue might be greater than the mileage, yet the loss of the mileage could not have been an inducement for the increase of the rates. The railroad company would be benefited by the increased revenue of the other company by a reduction or release from mileage, but it had no power over the charges of the Pullman Company. It is manifest that the contract did not in any way affect or tend to affect transportation or charges therefor.

Did the contract "create or carry out restrictions in the free pursuit of a business authorized or permitted by the laws of this State?" The antitrust Act does not create a new business for any person, nor does it give a new right in the property of others, but the object of the law was to prevent interference with business authorized and carried on in accordance with the laws of the State. It is therefore pertinent to inquire what business interest was in any way affected by this contract? The two companies unquestionably had the right to contract that the one should furnish the sleeping cars and maintain them, thereby furnishing accommodations to the passengers of the other, and to collect fares therefor. So far the contract is in conformity to law. This action rests alone upon the alleged illegality of the provision of the contract which grants to the Pullman Company the exclusive right to furnish sleeping cars for use on all lines of road owned or controlled by the Ft. Worth and Denver City Company, and all roads which it might thereafter acquire or operate. Waiving the fact that at the time the law of 1903 was enacted there was no other persons or company engaged in the like business in Texas, we come to the question, did the railroad company have the lawful right to make a contract with the Pullman Company, whereby it excluded all other companies, for fifteen years, from furnishing to the Railroad Company sleeping cars for use on all

of its lines? That question suggests this, did all sleeping car companies have a right to demand of the railroad company to haul their coaches on its railroad? If yea, the contract restricted the free pursuit of a lawful business and constitutes a trust under the Act of 1903, otherwise the law has not been violated by the agreement. The effect of this contract was that the railroad company rented from the sleeping car company its coaches, agreeing to haul them over its lines of road, the sleeping car company furnishing sleeping accommodations and other conveniences to such passengers of the railroad as should desire them. The demand of the traveling public for sleeping cars and like conveniences imposes upon railroads an obligation as potent as a rule of law; the demand must be complied with, which the carrier may do either by furnishing its own coaches or by contracting with another corporation as in this case. In order to justify a sleeping car company in furnishing such accommodations the railroad may give the exclusive right, because it is necessary to permanent and reliable service which is in the interest of the public. This contract in no way interfered with the right of any other sleeping car company, if any existed, to build or furnish its cars to other railroads. Neither the Pullman nor any other corporation or person had a right to have sleeping cars attached to the passenger trains of the Ft. Worth & Denver City Railroad Company, therefore, to exclude them did not restrict "the free pursuit of any business authorized or permitted by law," because such business was not authorized to be pursued on a railroad without the consent of the owner, and, since no such business right existed, it could not be restricted. Lewis v. Railroad Co., 10 Texas Ct. Rep., 423; Kates v. Atlanta Baggage and Cab Co., 107 Ga., 636; Express Cases, 117 U. S., 26; Chicago, St. L. & N. O. Ry. Co. v. Pullman So. Car Co., 139 U. S., 79; Fluker v. Georgia Ry. & B. Co., 81 Ga., 461; Barney v. O. B. & H. Steamboat Co., 67 N. Y., 301.

Lewis v. Railroad Company, above cited, was decided by the Court of Civil Appeals of the Second District in this State and an application for writ of error was refused by this court. In that case the facts showed that the railroad company had granted an exclusive privilege to one person to go upon its trains and solicit of passengers baggage to be hauled from the train to different parts of the city. Lewis was engaged in the same business at Mineral Wells and insisted that he had the right to have a solicitor upon the trains of that railroad with like privilege. The railroad company brought an action to enjoin him from so doing. The injunction was granted and at the trial was perpetuated by the trial court, which judgment was affirmed by the Court of Civil Appeals. It was contended that the contract between the railroad company and the person authorized to solicit on its train was a restriction upon a business authorized and permitted by the laws of this State. In a well considered opinion by Judge Speer, the Court of Civil Appeals held that while Lewis had the right to pursue that business, he could not prosecute it on the train of the railroad company without its consent.

In Kates v. Baggage Company, before cited, the Supreme Court of Georgia, in an elaborate and able opinion, held the railroad company

had the right to make a contract with one person, whereby it excluded all others from "the business" of soliciting baggage on its trains.

Express Cases (117 U. S., 1), consisted of three separate suits by express companies against three different railroads, to compel the latter to furnish the same facilities for carrying express matter on the respective railroads that the express companies had enjoyed under contracts which each railroad company had terminated. The issue is clearly stated in this language: "The exact question, then, is whether these express companies can now demand as a right what they have heretofore had only as by permission. That depends, as is conceded, on whether all railroad companies are now by law charged with the duty of carrying all express companies in the way that express carriers when taken are usually carried, just as they are with the duty of carrying all passengers and freights when offered in the way that passengers and freight are carried." Practically the same question is presented in this case. Upon a thorough examination of this issue the Supreme Court of the United States held that express companies had no such rights, and that a railroad company had the right to make contracts whereby it would limit the number of persons or companies who might pursue such a business on its train.

In Railroad Company v. Pullman Car Company, before cited, a contract almost identical in terms with this was the basis of the action; two cars of the Pullman Company having been destroyed, it brought suit upon the contract to recover for their value, to which the railroad company pleaded that the contract by which it gave the exclusive right to the Pullman Company to furnish sleeping cars for use upon the railroad was void, because it was contrary to public policy and was in restraint of trade. In answer to the contention that the contract was in restraint of trade, the Supreme Court of the United States said: "The stipulation, therefore, that the plaintiff, not being in default, should have the exclusive right for fifteen years to furnish drawing-room and sleeping cars for the defendant's use, and that the defendant should not, during that period, contract for cars of that kind with any other party, rightfully construed is not unreasonable, and, properly performed, will promote the convenience of the public in that it enables the defendant to have on its lines, at all times, and as the requirements of travel demand drawing-room and sleeping cars for use by passengers. It is a stipulation that does not interfere in any degree with its right and duty to disregard the contract whenever the plaintiff fails in furnishing cars that are adequately safe and sufficient in number for the travel on defendant's lines. The suggestion that the agreement is void, upon grounds of public policy, or because it is in general restraint of trade, can not, for the reasons stated, be sustained." That case is analogous to this and supports our conclusion.

Section 2 of the antitrust law of 1903 defines a monopoly as follows:

"Sec. 2. That a monopoly is a combination or consolidation of two or more corporations when effected in either of the following methods:

"1. When the direction of the affairs of two or more corporations is in any manner brought under the same management or control for the purpose of producing, or where such common management or control tends to create a trust as defined in the first section of this Act.

"2. . Where any corporation acquires the shares or certificates of stock or bonds, franchise or other rights, or the physical properties, or any part thereof, of any other corporation or corporations, for the purpose of preventing or lessening, or where the effect of such acquisition tends to affect or lessen competition, whether such acquisition is accomplished directly or through the instrumentality of trustees or otherwise."

The direction of the "affairs" of neither of the corporations to this contract is brought under the control of the other; nor are the affairs of both corporations brought under the management of another corporation or person. Neither of these corporations acquired the shares or certificates of stock or bonds of the other by this contract, nor does the contract transfer to either company any "franchise, or other rights, or the physical properties" of the other company. The agreement by the railroad company to haul the cars of the Pullman Company did not transfer to the latter any of the franchise of the former by which it was authorized to operate trains over the road. On the contrary, the railroad company in the performance of the contract exercised its franchise. The sleeping cars were the only physical "properties" which were involved, or in any way dealt with in this transaction, and they were not acquired by the railroad company, but remained the property of the Pullman Company. The control which the railroad company acquired over the sleeping cars did not tend to affect or lessen competition either in transportation by the railroad company or in the business of the sleeping car company. We conclude, therefore, that the contract between the two corporations "did not constitute a monopoly within the meaning of section 2 of the antitrust statute."

We answer both questions propounded in the negative.