## STATE v. GULF REFINING CO.*
### (No. 6880.)

(Court of Civil Appeals of Texas. Austin. Dec. 23, 1925. Rehearing Denied Jan. 20, 1926.)

Monopolies ⊗⇒17(2)—Lease of filling station equipment to be used exclusively in handling lessor's oils held not violative of statute.

Contracts under which oil company leased to dealer for nominal rental gasoline and lubricating oil equipment in consideration of dealer's agreement to use such equipment exclusively for storage and handling of company's product *held* not violative of Rev. St. 1911, §§ 7796–7798, as contracts to refuse to buy from others or as in restraint of competition.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by the State under the anti-trust laws against the Gulf Refining Company. Judgment for defendant, and the State appeals. Affirmed.

W. A. Keeling, Atty. Gen., and C. A. Wheeler, Riley Strickland, and Frank M. Kemp, Asst. Attys. Gen., for the State.

---

D. Edward Greer, Claude McCaleb, and John E. Green, Jr., all of Houston, and R. L. Batts, of Austin (H. L. Stone, Jr., of Pittsburgh, Pa., of counsel), for appellee.

McCLENDON, C. J. This was a suit by the state of Texas against the Gulf Refining Company, a Texas corporation, (1) to enjoin the latter from further observing certain contracts with retail dealers in gasoline and lubricating oils under which the Gulf Company leased to the dealers, at a nominal rental of $1 per year, tanks and pumps for handling products of the Gulf Company; (2) to recover penalties; and (3) to forfeit the charter of the Gulf Company, if the court should deem public interest required it. The suit was based upon the allegation that the contracts were violative of articles 7796 and 7798, R. S. of 1911, commonly known as the anti-trust law. There was a trial to the court without a jury, and judgment was rendered in favor of the Gulf Company. From this judgment the state has appealed.

The state urges 19 assignments of error, supported by 6 propositions, the substance of which may be summarized in the following contentions:

First. That the contracts and their observance contravene sections 1, 3, and 5 of article 7796, in that they constitute combinations of capital, skill, or acts which create or tend to create or carry out restrictions in trade or in the free pursuit of a lawful business. That they prevent or lessen competition in the sale and purchase of merchandise, produce, or commodities, and that they preclude a free and unrestricted competition among the parties and others in the sale of such commodities.

Second. That they contravene section 1, of article 7798, in that they constitute agreements or understandings "to refuse to buy from or sell to any other person, firm, corporation or association of persons," articles of merchandise, produce or commodity.

The controlling question in the case is whether the contracts in themselves, or as observed and carried out between the Gulf Company and the several dealers, constitute, as a matter of law, violations of the above-mentioned statutory provisions. The facts in the case are without substantial dispute.

It was shown that beginning in the year 1923, and up to the time the suit was filed, the Gulf Company had entered into a large number of these contracts, which were of two kinds, one a gasoline equipment contract, and the other a lubricant equipment contract. Pertinent portions of the former of these read as follows:

"Second. That said equipment shall be used solely for the storage and handling of gasoline supplied by the party of the first part (Gulf Company) under the terms of this agreement."

"Sixth. That in case the party of the second part (dealer) shall at any time use the said equipment for any other purpose than the storage and handling of gasoline purchased from the party of the first part, or should said second party cease for thirty (30) days to purchase gasoline from the party of the first part and sell the same in his regular trade, the right to the use of said equipment shall terminate, and the party of the first part shall thereupon have the right to enter upon the said premises and remove said equipment and every part thereof.

"Seventh. This agreement shall terminate forthwith upon the sale or other disposition of the premises by the party of the second part and in any event at the end of one year from the date thereof. Upon the expiration of this agreement, the party of the first part shall have the right to enter upon said premises and remove said equipment and every part thereof."

The lubricant equipment contract was not substantially different from the gasoline equipment contract, and it will not be necessary to set out its provisions further than to note that it provided for the loan of a 65-gallon portable wheel tank and pump, and had substantially the same restrictions as to use and other provisions contained in the gasoline equipment contract.

The evidence shows that the production and sale of gasoline and lubricating oils had grown from comparatively small proportions some 20 odd years ago to one of the most important industries at the present time; that, prior to the invention of the internal combustion engine, there was very little use made of gasoline, and it was a waste by-product in the refinement of kerosene oil; that the invention of the internal combustion engine created a larger demand for gasoline, but it was not until the automobile was perfected and put in general use as a vehicle that its consumption became very extensive; that from that time on the use of gasoline and lubricating oils increased enormously from year to year, and at the time of the trial of the case the daily consumption of gasoline in Texas amounted to approximately 1,000,000 gallons; that the manner of handling the gasoline was also materially changed during this period of 20 years; that originally it was supplied to the dealer in drums or cans, and in its handling there was of necessity a great deal of waste and expense, and a very large fire hazard; that eventually there was devised the underground tank with a measuring pump attached, which was first used at the curb or sidewalk, and later in what we now know as "drive-in" filling stations; that under this manner of handling there is very little waste from leakage or evaporation, the facility with which it is distributed minimizes the labor and consequent cost of distribution, and the fire hazard is reduced to a minimum; that these pumps and tanks can be purchased by any one having sufficient capital from various dealers at a cost installed

ranging from $200 to $300; that several years ago some of the larger refineries began the practice of supplying dealers with this equipment, either upon a loan, or nominal rental agreement similar to those in question, and other refineries followed; that some refineries, perhaps a large number of those of small capital, were unable financially to supply their dealers; that not all of the refineries that were financially capable of conducting their business in this manner did so, on the presumable ground that they did not find it necessary or regarded it as unprofitable; that there were no collateral agreements in connection with these contracts, and no attempts made to control the dealers in any way further than as provided by the express terms of the contract; that the competition between different refineries in the sale and distribution of gasoline and lubricating oils was very keen in the state of Texas, and probably more so than in other states; that there were some 175 or more concerns selling gasoline at wholesale in Texas which were active competitors of the Gulf Company; that of these some 5 or more were in competition generally throughout the state and the others in competition in various localities; that the Gulf Company supplied approximately 20 per cent. of the total amount of gasoline consumed in the state, and about 20 per cent. of their product, constituting approximately 5 per cent. of the total amount consumed in the state, was distributed through equipment loaned or leased under the contracts in question; that there were a number of dealers in the larger cities who had tanks and pumps of more than one concern on the same premises, but as a usual thing, and especially in the smaller communities, a dealer would use only one tank and pump, that being sufficient for his needs; that under the contracts themselves, and as carried out, the dealer was free at any time to have as many tanks and pumps on his premises of different concerns as he could arrange for, and was also free to discontinue the use of the Gulf Company equipment and cancel the contracts at will; that many dealers purchased their own equipment and used the gasoline of the Gulf and other companies through such equipment as they saw proper; that the practice of supplying the equipment under the contracts in question had had the effect of largely increasing the number of dealers and placing the products all over the state, at the rural crossroads, as well as in villages, towns, and cities; that the practice sought to be enjoined in this suit had been begun prior to 1923 by some of the Gulf's competitors, but it was not until that year and after the contracts had been held to be legal by the Supreme Court of the United States that the Gulf Company began the practice in this state.

The evidence further shows that the Gulf Company, in its 20 years of business in Texas and elsewhere, has featured and spent large sums of money in advertising its products under the trade-names of "Supreme Auto Oil" and "That Good Gulf Gasoline," under which trade-names they have become widely known, and a large demand therefor has been created. The leased or loaned equipment carries these trade-names, and the purpose of the practice in question was to put the products of the Gulf Company within easy reach of customers, and "to assure the purchaser that, when he calls for Supreme Auto Oil or That Good Gulf Gasoline, he will get products vouched for by appellee."

The Federal Trade Commission took the view that these contracts violated both section 3 of the Clayton Act (U. S. Comp. St. § 8835c) and section 5 of the Federal Trade Commission Act (U. S. Comp. St. § 8836e), and ordered 30 or more refineries and wholesalers to abandon the practice. This order was attacked in the federal courts and was held void by Circuit Courts of Appeals.

The matter finally came before the Supreme Court of the United States in four of these cases which were against the Sinclair Refining Company, Standard Oil Company of New Jersey, appellee Gulf Refining Company, and Malone Oil & Manufacturing Company. The cases were consolidated, and in an opinion delivered April 9, 1923 (261 U. S. 463, 43 S. Ct. 450, 67 L. Ed. 746), the court held that the contracts did not violate either of the acts in question. The contracts of the Gulf Company were the same as those involved in the present suit, and the other contracts were not essentially different.

Section 3 of the Clayton Act makes it unlawful for those engaged in interstate commerce to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodity, whether patented or unpatented, on condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale, or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

In disposing of this branch of the case, the court say:

"There is no covenant in the present contract which obligates the lessee not to sell the goods of another; and its language cannot be so construed. Neither the findings nor the evidence show circumstances similar to those surrounding the 'tying' covenants of the Shoe Machinery Company. Many competitors seek to sell excellent brands of gasoline, and no one of them is essential to the retail business. The lessee is free to buy wherever he chooses. He may freely accept and use as many pumps as he wishes, and may discontinue any or all of them. He may carry on business as his judg-

ment dictates and his means permit, save only that he cannot use the lessor's equipment for dispensing another's brand. By investing a comparatively small sum, he can buy an outfit and use it without hindrance. He can have respondent's gasoline, with the pump or without the pump, and many competitors seek to supply his needs.

"The cases relied upon are not controlling."

The cases referred to are those of the Standard Fashion Company and the United States Shoe Machinery Corporation, reported, respectively, in 258 U. S. 346, 42 S. Ct. 360, 66 L. Ed. 653, and 258 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708. It is not necessary to point out the substantial and controlling differences between those cases and the case at bar.

Section 5 of the Federal Trade Commission Act denounces as unlawful unfair methods of competition in commerce, and provides that:

"The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, and common carriers subject to the acts to regulate commerce, from using unfair methods of competition in commerce."

After stating that the Circuit Courts of Appeals had decided that the practice under consideration was not violative of the Federal Trade Commission Act, the court say:

"And we find no sufficient reason for a contrary conclusion. Certainly the practice is not opposed to good morals because characterized by deception, bad faith, fraud, or oppression. Federal Trade Commission v. Gratz, 253 U. S. 421, 427, 995, 40 S. Ct. 572, 64 L. Ed. 993. It has been openly adopted by many competing concerns. Some dealers regard it as the best practical method of preserving the integrity of their brands and securing wide distribution. Some think it is undesirable. The devices are not expensive—$300 to $500—can be purchased readily of makers, and, while convenient, they are not essential. The contract, open and fair upon its face, provides an unconstrained recipient with free receptacle and pump for storing, dispensing, advertising, and protecting the lessor's brand. The stuff is highly inflammable and the method of handling it is important to the refiner. He is also vitally interested in putting his brand within easy reach of consumers with ample assurance of its genuineness. No purpose or power to acquire unlawful monopoly has been disclosed, and the record does not show that the probable effect of the practice will be unduly to lessen competition. Upon the contrary, it appears to have promoted the public convenience by inducing many small dealers to enter the business and put gasoline on sale at the crossroads.

"The powers of the Commission are limited by the statutes. It has no general authority to compel competitors to a common level, to interfere with ordinary business methods, or to prescribe arbitrary standards for those engaged in the conflict for advantage called 'competition.' The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending

forces ordinarily engendered by an honest desire for gain. And to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs.

"The suggestion that the assailed practice is unfair because of its effect upon the sale of pumps by their makers is sterile and requires no serious discussion."

The state contends that our anti-trust laws are not substantially the same as the Clayton Act; and, further, that the so-called rule of reason that has been applied by the Supreme Court of the United States to the federal statutes, has not been adopted in our state.

The material difference between the two enactments for which the state contends is that our statutes inhibit any combination or agreement to lessen competition, or which may preclude free and unrestricted competition, or carry out restrictions in the free pursuit of a lawful business; whereas the Clayton Act merely prohibits contracts or agreements which have the effect to substantially lessen competition or tend to create monopoly. We may concede that this difference is substantial, but we are quite clear in the view that, regardless of this difference, the contracts and the practices indulged in under them are not violative of article 7796. They do not, therefore, in terms, or in their practical operation in any manner which the law recognizes, create or tend to create restrictions in trade or the free pursuit of a business, or lessen or preclude free and unrestricted competition. They may have the effect in individual instances of inducing a dealer to buy only the products of the Gulf Company, but such result does not flow from the terms of the contract itself, or from the practices of the parties in its execution. It results, if at all, from the very nature of the business engaged in and the individual desires of the dealers themselves. The clear holding of the Supreme Court of the United States in the above quotation is that these contracts not only do not substantially lessen competition, but that they do not lessen competition at all. In one very material and substantial respect the effect of the practice is to greatly enhance competition, in that it puts more dealers in the field and places the product dealt in at the disposal of the buyer in all parts of the country where the demand is sufficient to warrant the expense of furnishing and installing the equipment.

Section 1 of article 7798 here invoked denounces as illegal contracts or understandings "to refuse to buy from or sell to" another. This provision of our anti-trust laws our courts have held they will construe literally without reference to whether there is any deleterious effect on trade or competition shown. They have held, in other words, that, where there has been a clear violation of the provisions of this article, they will not apply the "rule of reason," nor will they look to the

effect of the contract, but will enforce the statute as written.

The provision in question denounces what we might conveniently term "exclusive contracts"; that is, contracts not to deal or trade with others. The contract in question is, however, not exclusive, except in a limited sense. It only inhibits the dealing with others in so far as such dealing may be curtailed or limited by prohibiting the handling of the products of others through Gulf equipment.

There have been three anti-trust statutes passed in this state, the Acts of 1889, 1895, and 1903. The first two of these acts dealt with combinations which it denominated as "trusts," and the third with three classes of combinations, denominated "trusts," "monopolies," and "conspiracies against trade." R. S. 1911, Acts 7796, 7797, and 7798. Some of the reasons for the several enactments are pointed out in the Palatine Insurance Co. Case (Tex. Com. App.) 238 S. W. 637. There have been many cases brought under the 1903 and the prior acts, and their various provisions have been construed and adjudicated from almost every conceivable angle. In spite of these adjudications, however, the 1903 act remains unchanged to this day, and has been carried forward in its original language into the codifications of 1911 and 1925. These several constructions of the act should therefore be now regarded as having the sanction both of the courts and the Legislature. In construing the act, and its several provisions, the courts, with substantial uniformity, have recognized four well-defined exceptions to the rule that all exclusive contracts are within the inhibitions of the act. These exceptions may be stated as follows:

First. Contracts of agency, wherein the agent is prohibited, either generally or to a limited extent, from dealing for himself or representing others besides his principal. Welch v. Windmill Co., 89 Tex. 653, 36 S. W. 71.

Second. Contracts for the sale of a business and the good will attaching to it, in which the seller agrees for a limited time not to engage in a competing business within a limited territory. Gates v. Hooper, 90 Tex. 563, 39 S. W. 1079; Queen Insurance Co. v. State, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483; and numerous other cases cited in V. S. Ann. Stat. under articles 7796 and 7798, and in Jennings v. Laundries Co. (Tex. Civ. App.) 276 S. W. 726.

Third. Contracts of lease where the lessee binds himself as regards the rented premises either to sell only the products of the lessor, or not to sell the products of a competitor. Celli & Del Papa v. Brewing Co. (Tex. Com. App.) 227 S. W. 941; s. c. (Tex. Civ. App.) 186 S. W. 278; Edwards v. Old Settlers' Ass'n (Tex. Civ. App.) 166 S. W. 423; Redland Fruit Co. v. Sargent, 51 Tex. Civ. App. 619, 113 S. W. 330.

Fourth. Cases in which an exclusive right or privilege is granted upon the property or premises of the grantor. Railway v. State (Pullman Co. Case) 99 Tex. 34, 87 S. W. 336, 70 L. R. A. 950; Lewis v. Railway, 36 Tex. Civ. App. 48, 81 S. W. 111.

It is clear that the contracts in question fall strictly within the third exception noted, and under the authorities cited are not within the provisions of articles 7796 or 7798. We do not think it necessary to discuss in detail the authorities supporting these various exceptions, or to enter into a lengthy application of the case at bar to the third exception mentioned. We shall only state briefly the contentions of the state in this regard, and our reasons for not adopting them.

The state contends that the Celli & Del Papa Case is not in point, for the reason that the court justified its holding therein on two grounds, first, because of the inherent right of the owner to control premises belonging to him; and, second because in reality there is no combination of capital, skill, or acts within the meaning of the anti-trust statutes where the landlord leases his premises to a tenant.

The case in question does not hold that there is no combination of capital, skill, or acts in a contract for the lease of real estate. On the contrary, it is assumed in the opinion in that case, as we now assume here, that there was such combination; but it is held, and that is the sole ground on which the case was decided, that an exclusive provision in a lease contract is not within the provisions of our anti-trust laws.

The further contention is made by the state that, if the holding in the Celli & Del Papa Case is correct as applied to real estate, then the courts should not further stretch the rule by making it elastic enough to apply to personal property. We quote from the state's brief:

"If the rule which appellee contends is announced in the Celli & Del Papa Case is applicable to personal property, then our anti-trust laws had as well be stricken from our statutes, because such a holding would render them null and void. Under such a rule the wholesaler could control the retail merchant absolutely, by furnishing the fixtures to be used in the retail store, with a contract that no goods except those sold by the wholesaler should be used in connection with the fixtures. And it could be said in that event by the appellee in the present case that such contract would not be in violation of the anti-trust statutes because the merchant would be left free to procure other fixtures if he desired to, handle other goods, or that the merchant might take out such fixtures and install his own, or those of a competitor of the wholesaler. If such be the rule, and it can be applied to personal property, then the wholesaler could furnish the retailer a set of light fixtures for his store and provide by contract that the leased lights should never shine on any goods except those sold by the wholesaler, or might provide, in the event of a retailer just entering business, and who is just completing a store build-

ing, the door frame to the only entrance in the building or to all of the entrances, if more than one, under a contract that no goods except those sold by the wholesaler should ever pass through such leased frame or frames.

"We think our courts went far enough (and a little the rise) in the Celli & Del Papa Case when it said that the owner of the premises had the right to say what should not be done by his tenant, without being guilty of violating the anti-trust laws, and we contend our courts should not go further and hold that the anti-trust laws cannot be violated by one on his own premises and then apply the rule to personal property as well."

Our view of the contention set forth in this quotation may be disposed of by the statement that we are not here dealing with hypothetical cases, or with subterfuges to evade the provisions of the anti-trust statutes effected by the execution of contracts nominally within the letter of the exception enforced in the Del Papa and similar cases. It will be sufficient to deal with the question of evasions when they are properly presented in a state of facts calling for adjudication. We are here considering only the contracts and practices involved in the case at bar. To our mind the evidence negatives any evasion. It clearly shows, to the contrary, a legitimate practice which conflicts with no provision of our anti-trust statutes.

If the practices sought to be enjoined were attendant with the dire consequences contended for, the burden of so showing clearly rested upon the state—a burden which the state has clearly failed to meet. The language of the Supreme Court of the United States in characterizing these contracts, and in describing the effect of the practices here involved, so completely and forcibly answers every argument made by the state that a more extended discussion is unnecessary.

It may not be amiss to note that, in the cases cited in support of the third exception above, none of the opinions were written by the Supreme Court itself. A writ of error was refused, however, in the Old Settlers' Ass'n Case, and the Celli & Del Papa Case was by the Commission of Appeals. In that case the decision of the Commission was against the writ; the notation upon granting it being:

"We are inclined to believe the court erred in approving the ruling of the trial court in giving a peremptory instruction."

The learned Chief Justice, who wrote this notation, also directed the order adopting the judgment recommended by the Commission. The holding of the Commission, which we think is conclusive of the present case, was absolutely essential to the judgment which the Commission recommended and the Supreme Court adopted.

There is no merit, we believe, in the contention that the rule applied in the last two cases cited should not be extended to personal property. The differences in the rights attaching to the ownership of real and personal property have no bearing upon the present controversy.

In view of the above conclusions, we find it unnecessary to consider constitutional questions which are raised by appellee.

The trial court's judgment is affirmed.

Affirmed.