CENTRAL NEW YORK TELEPHONE & TELEGRAPH CO. v.
AVERILL et al.

(Supreme Court, Appellate Division, Fourth Department. January 6, 1909.)

1. CONTRACTS (§ 123*)—VALIDITY—RESTRAINT OF TRADE.
    Every contract in restraint of trade or every exclusive privilege granted by a corporation is not violative of public policy, but the test is generally whether the restricting provision is unreasonable or in its scope will injure the part of the public which may be affected by it.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 542–552; Dec. Dig. § 123.*]

2. CONTRACTS (§ 123*)—VALIDITY—RESTRAINT OF TRADE.
    In determining whether a contract giving an exclusive privilege is violative of public policy, the rights of the parties to the contract as well as the public's rights should be considered.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 570–575; Dec. Dig. § 123.*]

3. CONTRACTS (§ 138*)—VALIDITY—RESTRAINT OF TRADE—EXCLUSIVE TELEPHONE SERVICE IN HOTEL.
    A hotel company voluntarily contracted with a telephone company to install an exchange in its hotel. The telephone company was to defray the expense of equipment, and have the exclusive exchange rights in the hotel for 10 years. It did not appear that the rates charged were unreasonable, nor that the service was unsatisfactory, nor that any other competing hotel nor the public generally had complained of any unjust discrimination because of the contract, nor had any public official questioned the validity of the contract, but, so far as appeared, only the parties to the contract were affected by it. *Held*, that the hotel company could not have the contract annulled as granting an exclusive privilege in violation of public policy after it had been partially performed and avoid liability for further performance and obligations already incurred thereunder, especially where it appeared that its object was to permit a rival telephone company to install an exchange and enjoy an exclusive privilege in the hotel.
    [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 687; Dec. Dig. § 138.*]
    McLennan, P. J., dissenting.

Appeal from Equity Term, Onondaga County.

Action by the Central New York Telephone & Telegraph Company against Charles S. Averill and another. From a judgment dismissing the complaint, plaintiff appeals. Reversed, and new trial granted.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The action is in equity to restrain the defendants from removing a private telephone exchange installed in the Yates Hotel in the city of Syracuse, and a temporary injunction was granted which was subsequently dissolved by the Special Term of this court, and upon the trial of the action the complaint was dismissed upon the merits, with costs to the defendants.

See, also, 58 Misc. Rep. 59, 110 N. Y. Supp. 273.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Edwin Nottingham, for appellant.

A. H. Cowie, for respondents.

SPRING, J. The allegations in the complaint are admitted. The plaintiff is a corporation carrying on the telephone business in the city of Syracuse and elsewhere, and the defendants are the proprietors of the Yates Hotel in that city. On the 8th day of August, 1902, the said parties entered into a written contract whereby the plaintiff agreed to install in the said hotel "a private telephone exchange," comprising suitable wires, switchboards, apparatus, and 120 stations connecting with the various rooms, and making a complete telephone exchange equipment, and uniting with its main office in the city. The amount of rentals and other payments therefor by the defendants are set out in the agreement. The telephone system was to be completed for use by September 9, 1902; the contract was to continue in force for nine years from that day.

The gist of the controversy is over the following provisions:

"It is understood and agreed by both of the parties hereto that the switchboard apparatus, wires, cables and fixtures furnished under this contract shall be and remain the property of the said Central New York Telephone and Telegraph Company, and that the instruments and apparatus are placed in said Yates Hotel for the purpose herein named, and that no instruments or wires other than those furnished by the first party are to be placed or maintained in said hotel or connected with or maintained in connection with said switchboard apparatus, or fixtures, and that said instruments, apparatus, lines or fixtures of the first party are not to be connected with or used in connection with any exchange office or telephone except those of the first party or its connections and only by lines connecting said switch-board with the company's exchange office and switch-board as within provided."

The system was installed at an approximate expense of $2,700, and operated and carried on by the plaintiff in full compliance with the agreement. On the 12th day of April, 1906, the defendants caused a written notice, duly signed, to be served on the plaintiff notifying it—

"that the undersigned have decided to terminate said contract, and that the same will be no longer in force or binding between the parties thereto, after the expiration of thirty days from the service of this notice."

At the time of the service of such notice the plaintiff was performing its agreement in a satisfactory manner, and intended in good faith to continue such performance during its entire life, and the defendants were indebted to it for rentals and telephone service in pursuance of said agreement for over $1,600. The defendants threatened and intended to discontinue wholly the use of said telephone system, and to equip said hotel throughout with another private telephone ex-

change furnished by a rival telephone company. The admission in the answer is:

"That it is the intention of the defendants to place in said Yates Hotel other telephone instruments besides those of the plaintiff herein, and are about to discontinue and abandon the use of the private hotel exchange with which said hotel is now equipped belonging to the plaintiff."

The alleged justification for this repudiation of the agreement by the defendants is that the clause by which it was agreed that the telephone instruments or wires of no other company were to be placed or maintained in said hotel during the life of said contract is in contravention of public policy, and therefore avoided the agreement in its entirety, and the court below has so held.

The contract was voluntarily made. It is not claimed that the charges in pursuance of it have been unreasonable or extortionate, or that the service has been in any way inefficient or unsatisfactory. There is no suggestion that the plaintiff has refused to furnish a similar system to any other hotel at the same rates charged the defendants, or that the guests of the Yates Hotel, or the people of Syracuse, or the public generally have ever complained of or suffered from the exclusive use of the plaintiff's telephone system in said hotel. In fact, it is not the purpose of the defendants to maintain two telephone systems in their hotel. If they can terminate this agreement with five years or more of life in it, they intend to substitute another telephone exchange, and there is no pretense that the public or the guests of the hotel would be better served by the competing exchange than by the one now in use.

The defendants, in addition to strangling the life of the agreement, intend, and so far have succeeded, to avoid the payment of over $1,600 fairly and justly due the plaintiff for services performed in strict compliance with the agreement, and to inflict a further pecuniary loss upon the plaintiff of $2,700 expended in such equipment, as the court below has found. In addition, it must lose the revenues and the profits of its contract for the five years in which it was intended to be effective. It is also to be observed that it is admitted in the answer the inducement for expending the large sum in the placing of the local telephone exchange in the hotel was the so-called "exclusive clause" in said agreement, and such expenditure would not have been incurred except for such provision.

Practically the only persons to be benefited by this summary cutting short of this agreement are the defendants. As a concrete fact the public, whether that term is to be inclusive of guests of the hotel, the citizens of Syracuse, or the more intangible public generally, are not interested in the question of the validity of this agreement. It may be necessary on the principle of public good to aid the defendants in their unjust disavowal. In this particular instance the assertion of the principle of public policy is to aid the defendants, and for no other purpose. In these circumstances, therefore, the necessity for upholding this decision must be clear and convincing, when its only real effect is to enable the defendants to avoid liability on an agreement willingly made, and the premature ending of which will result so disastrously to

the plaintiff. It is not every contract in restraint of trade, or every exclusive privilege granted by a corporation, which runs counter to public policy. The test of its validity generally is whether the restricting provision is unreasonable, or in its scope will operate to the injury of the public which may be affected by it. In the early stages of judicial decisions on this subject, the courts, in their delirium to enshrine public policy, overrode liberty of contract, so essential to the safeguarding of personal rights and the development of commercial and business enterprises. With the growth and magnitude and variety of industrial affairs, the judicial pendulum swung in its arc the other way. The more recent expositions of the law uphold such contracts unless the vice suggested pervades them.

In Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 437, the court in its consideration of this subject quotes approvingly this extract from Chief Justice Tindal (Horner v. Graves, 7 Bing. 735), who declared the test to be "whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public"; and the court added:

"Indeed, what public policy requires is often a vague and difficult inquiry. It is clear that public policy and the interests of society favor the utmost freedom of contract, within the law, and require that business transactions should not be trammeled by unnecessary restrictions. * * * In the present state of the authorities we think it cannot be said that the early doctrine that contracts in general restraint of trade are void, without regard to circumstances, has been abrogated. But it is manifest that it has been much weakened, and that the foundation upon which it was originally placed has, to a considerable extent at least, by the change of circumstances, been removed."

The defendant in that case was a manufacturer of friction matches, carrying on an extensive business. He sold his tangible assets used in the business, his good will and trade-mark, to a corporation, covenanting that for a period of 99 years he would not engage in that business in the United States, except in Nevada and Montana, so the restriction included practically the entire country. He resumed business, and an action was commenced on the covenant to restrain him from carrying it on, and he defended, alleging that the agreement was in restraint of trade, was against public policy, and illegal. The court sustained the judgment in favor of the plaintiff, holding that the covenant was partial, not general. The same principle has been declared in Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363, 1 L. R. A. 456; Hodge v. Sloan, 107 N. Y. 244, 17 N. E. 335, 1 Am. St. Rep. 816; Wood v. Whitehead Bros. Co., 165 N. Y. 545, 59 N. E. 357; Walsh v. Dwight, 40 App. Div. 513, 58 N. Y. Supp. 91.

In N. Y. Bank Note Co. v. Hamilton Bank Note Co., 180 N. Y. 280, 73 N. E. 48, Chief Judge Cullen, in discussing this proposition, said at page 293 of 180 N. Y., at page 52 of 73 N. E.:

"We are of opinion also that the contract is not so unreasonable in its re straint of trade as to be condemned on that account. Contracts creating reasonable restraints of trade have generally been upheld, the question in most cases being whether the restraint was reasonable or not. The old cases judged

such contracts by very strict standards, but they have been regarded more favorably by later decisions."

I cite these authorities for the purpose of showing that the trend of the current decisions is towards upholding freedom of contract, unless the agreement is permeated with the vice of unreasonable rates or its enforcement will be manifestly injurious to the public. I find no case construing a covenant precisely like the one under consideration.

There are those, however, which I think are akin in principle. In Lough et al. v. Outerbridge et al., 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674, 42 Am. St. Rep. 712, the plaintiffs were commission merchants in New York City, engaged in the transhipment of merchandise to the Windward and Leeward Islands. The defendant steamship company, a foreign corporation, was a common carrier transporting freight between the same points with five or six large iron steamers. In December, 1891, the rate of freight from New York to Barbadoes was 40 cents per dry barrel, and these steamers sailed on scheduled days and were shippers and carriers of passengers. The British steamer El Callao also went over this route at intervals of five or six weeks, and was a competitor of the defendant steamship company. In order to retain its business, the defendant offered to transport freight from New York to these Islands for 25 cents a dry barrel to all merchants who would use its line exclusively to these points during the week that the British steamer was taking on freight in New York. In February, 1892, and when the El Callao was loading, the plaintiff demanded that the defendant steamship company receive 3,000 barrels of freight at the stipulated rate of 25 cents a barrel. The defendants offered to accede to this demand, providing the plaintiffs would ship all their freight to Barbadoes by its line, which the plaintiffs declined to do, as they were shipping also by the El Callao. Another similar attempt was made by the plaintiffs, which was declined in the same manner. The regular rate of 40 cents was maintained by the defendant steamship company at all times, except during the week when the El Callao was loading its cargo. There was no discrimination by the defendant steamship company. It was willing to take all shipments at 25 cents per barrel during the week the competing vessel was taking on freight, only it insisted on being the exclusive carrier of freight of those accepting the reduction. At other times it received all shipments at the regular rate of 40 cents, which was a reasonable charge, while the reduced rate was not profitable. The evident purpose of the plan was to control the trade and drive out its competitor. The plaintiffs commenced an action in equity to compel the steamship company to receive other freight at the reduced rate, the same as other shippers, without the exaction that they ship all their freight by that line. The plaintiffs relied upon the proposition that the steamship company, a common carrier, was bound to receive their goods, and that the condition imposed was against public policy. The plaintiff failed in the action on the trial, and the judgment was affirmed by the General Term and the Court of Appeals. The latter court, after a very extended review of the cases, used this language:

"The mere fact that the transportation business between the two points was in the hands of the defendants did not necessarily create a monopoly, if the

general rates maintained were reasonable and just. It is not pretended that the owners of the El Callao proposed to give regular service to the general public for any less. When the service is performed for a reasonable and just hire, the public have no interest in the question whether one or many are engaged in it. The monopoly which the law views with disfavor is the manipulation of a business in which the public are interested in such a way as to enable one or a few to control and regulate it in their own interest and to the detriment of the public by exacting unreasonable charges. But when an individual or a corporation has established a business of a special and limited character, such as the defendants in this case had, they have a right to retain it by the use of all lawful means. That was what the defendants attempted to do against a competitor that engaged in it, not regularly or permanently, but incidentally and occasionally. The means adopted for this purpose was to offer the service to the public at a loss to themselves whenever the competition was to be met, and when it disappeared to resume the standard rates, which, upon the record, did not at any time exceed a reasonable and fair charge. I cannot perceive anything unlawful or against the public good in seeking by such means to retain a business which it does not appear was of sufficient magnitude to furnish employment for both lines. On this branch of the argument the remarks of Lord Coleridge in the case of Mogul S. S. Co. v. McGregor (L. R. 152, B. Div. 476) are applicable: 'The defendants are traders with enormous sums of money embarked in their adventure, and naturally and allowably desire to reap a profit from their trade. They have a right to push their lawful trades by all lawful means. They have a right to endeavor, by lawful means, to keep their trade in their own hands, and by the same means to exclude others from its benefits, if they can. Amongst lawful means is certainly included the inducing by profitable offers customers to deal with them rather than with their rivals. It follows that they may, if they see fit, endeavor to induce customers to deal with them exclusively by giving notice that only to exclusive customers will they give the advantage of their profitable offers. I do not think it matters that the withdrawal of the advantages is out of all proportion to the injury inflicted by those who withdraw them on the customers who decline to deal exclusively with them, dealing with other traders.' "

The whole groundwork of the decision rests upon the fact that the 40-cent rate was reasonable, so that no injustice to the public was perpetrated by reducing the charge below a remunerative price in order to retain the trade, and, incidentally to prevent competition.

In the present case there is the same dominant principle of reasonable rates, and with the important additional fact that the plaintiff is seeking to enforce a fair agreement already partially performed. It is quite patent that a competing telephone system in the hotel will not be lucrative, nor is it necessary. If so, the defendants would be insisting that the present exchange be retained and the other one installed, in order that the patrons of the hotel might enjoy the advantages of the two systems. The defendants apparently desire to abandon one system for another. Either one will have the exclusive use of the hotel. It is the sole use of the plaintiff to which the defendants seem to object.

In Oakes v. Cattaraugus Water Company, 143 N. Y. 430, 38 N. E. 461, 26 L. R. A. 544, the plaintiff was employed by the defendant water company for one year at $1,000. He had contemplated applying to the village trustees for the privilege of forming a corporation to put in a water system. As part consideration of the sum to be paid him, he abandoned the project he had in view, so that the defendant had a clear field for its enterprise. In an action to recover the $1,000 it was claimed that the agreement was invalid on the ground of moral-

ity and public policy.   The court disposed of this contention as follows :

"If the business of a private individual or corporation is. threatened with competition, it is not illegal or immoral if one can persuade his competitor to abandon an enterprise in which both cannot succeed and take employment with the one remaining in the business at a stated compensation.   Such an agreement fairly entered into is legitimate business.   If the parties in this case deemed it for the interest of both that only one application should be made for a franchise that could be granted to but one of them, the arrangement does not, as I conceive, violate any settled rule or principle of public policy."

I refer also to Matthews et al. v. Ass. Press of S. N. Y. et al., 136 N. Y. 337, 32 N. E. 981, 32 Am. St. Rep. 741; Bald Eagle Valley R. R. Co. v. Nittany Valley R. R. Co., 171 Pa. 284, 33 Atl. 239, 29 L. R. A. 423, 50 Am. St. Rep. 807.

Cases are cited to sustain the contention of the defendants, like Cummings v. Union Blue Stone Company, 164 N. Y. 401, 58 N. E. 525, 52 L. R. A. 262, 79 Am. St. Rep. 655, where the parties attempted to create a monopoly of nearly all the marketable Hudson River blue stone, which was an enormous business; and People v. Milk Exchange, 145 N. Y. 267, 39 N. F. 1062, 27 L. R. A. 437, 45 Am. St. Rep. 609, where the directors of the defendant endeavored to fix the price of milk in the city of New York, and these combinations were held to be inimical to public policy.   The public in those cases were injuriously affected, and each attempt was to control the market on a large scale, and certainly transactions of that character could not be upheld.   Other cases are presented, of which Gibbs v. Consolidated Gas Co. of Baltimore, 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979, is a type, where the combination was within the condemnation of an express statute, and which cases are not applicable.

In most of the cases of this kind there are two dominating principles to be kept in view—the freedom of persons to contract, and the preservation of the public from unlawful encroachments or combinations.   They are often antagonistic.   There should be no restriction upon the parties to make their own agreements, unless it is obvious that the public will suffer by their enforcement.   When that appears, the rights of the public must prevail, for it is the law of every civilized nation that private rights must yield to those of the public when they are in conflict.   The certainty and universality of this principle require from the courts careful scrutiny before it obtains to the detriment of parties who have made and are seeking to enforce agreements fairly entered into.   Public policy should not be made the refuge of parties to violate their agreements.

Consequently, in measuring the effect of an agreement of this kind, we are not alone to consider the public, which may be interested only in a theoretical way, but the rights of the parties to the agreement must not be overlooked.   The residents of a street or of a village may get telephone service at a low rate if the use is confined to one company.   If there are two or three competing lines, each occupying the residences on the same street and with the same general connections, the added original cost and the expense of operation and maintenance with the division of revenues must eventually increase the

charge to the patrons if the companies continue the business. The customers are the sufferers in the end. The term "public" is a variable one, and these customers may comprise the public so far as that locality is concerned. The people at large or of the whole village may not be interested in the agreement with the citizens of this street to the extent of securing its abrogation.

A gas company agrees with an individual to furnish light in his house for 10 years at a low rate, and is to have the exclusive privilege of so doing. The fixtures are placed, and the contract is in process of performance. A competing company attracts the attention of the customer, and he proposes to end the existing agreement. The reason for this course is not found in any inadequacy of service, or failure to perform to the full measure, or in any unreasonableness of price. The sole ground is that the exclusive privilege—which was the inducement for the original expenditure—and the low rate offend against the public. Add to this statement the fact that the abandonment of the use of the light being supplied is to enable the other company to succeed it and furnish the sole supply, and the position of the defendants is exemplified. It seems to me that the ratification of this position by the courts would be carrying the condemnation of private contracts as offending against public policy farther than any case has gone. The defendants elected to enter into this agreement for their benefit, and encouraged the large original expenditure, which must now be lost to the plaintiff if the defendants' scheme prevails. It was natural and reasonable that the plaintiff, before making the large outlay required, should be assured of two things—the continuance of the agreement for a definite time, and the exclusive use of its exchange in the hotel, as the defendants understood. No other competing hotel complains that any unjust discrimination has resulted from the performance of the agreement. No official charged with conserving the interests of the public has signified any desire to test the validity of the agreement. So far as appears, only the parties to the agreement are affected by it, and yet, on the pretense that the rights of the public are endangered, the courts are asked to allow the defendants to disclaim liability for their further performance and evade the payment of obligations already incurred in furnishing the service which it entailed. I think there is no necessity for making the public the scapegoat of this plan. The judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide event.

Judgment and order reversed, and a new trial granted with costs to the appellant to abide event. All concur, except McLENNAN, P. J., who dissents.