## CONTRACTS FOR EXCLUSIVE INTERCHANGE OF TELEPHONE BUSINESS.

Circuit Court of Van Wert County.

THE UNITED STATES TELEPHONE CO. v. THE MIDDLEPOINT HOME TELEPHONE CO.*

Decided, 1910.

*Contract—For Exclusive Interchange of Business Between Telephone Companies Binding, When—Construction of Statutes Conferring Charter Power—Upon what Jurisdiction of the Courts Rests—Possible Contingencies—Parties—Injunction—Sections 9171, 9182 and 9191, General Code.*

1. A contract between a telephone company engaged in operating a local exchange and a telephone company engaged in long distance service, for the physical connection of lines and interchange of business for a period of ninety-nine years, where partly performed and of material benefit to the party seeking its avoidance, and where the other party upon faith of and in performance of said contract has made large expenditures, is binding.
2. Such contract for exclusive interchange of business originating on the lines of the one and destined to points reached by the other is within the purview of Section 3455, Revised Statutes, and is not obnoxious to public policy.
3. Section 3462, Revised Statutes, requiring dispatches to be received and transmitted from and for other telegraph lines, made applicable to telephone companies by Section 3471, Revised Statutes, does not, when read in connection with Section 3455, Revised Statutes, extend to through verbal communication requiring physical connection of independent lines.
4. Injunction is an appropriate remedy to restrain certain specific acts threatened to be committed in violation of such contract.
5. A stranger to the contract sought to be annulled, although claiming under an impairing contract, is not a necessary party.

ALLREAD, J.; HURIN, J., concurs; KINDER, J., dissents.

This action began in the court of common pleas. It is founded upon a contract for an exclusive interchange of telephone busi-

---

* Affirming *U. S. Telephone Co.* v. *Middlepoint Home Telephone Co.*, 7 N.P. (N.S.), 425.

ness between the plaintiff and the defendant companies. The relief sought is an injunction against the defendant company from a violation of the contract by connecting its exchange with and routing business over the lines of the Central Union Telephone Company.

A temporary injunction was allowed in that court as prayed for and made permanent upon final hearing.

An appeal has been taken and the cause submitted here upon the pleadings and evidence, and upon elaborate and able argument of the respective counsel.

As a preliminary to a discussion of the legal principles involved it may be recited that the Middlepoint Home Telephone Company, an incorporation of Ohio, is a characteristic local telephone company with village and rural lines, a central exchange in the village of Middlepoint, Van Wert county, and toll service connection with the county seat exchange at Van Wert.

The Central Union Telephone Company is incorporated under the laws of the state of Illinois, and engaged in the operation of both local and long distance service in the various cities, towns and villages throughout the states of Ohio, Indiana and Illinois, has a pay station and at least two local telephones in the village of Middlepoint and operates in connection with and through the American Telegraph & Telephone Company, a long distance company incorporated under the laws of New York, and extending throughout the United States and into portions of Canada.

The Central Union and the American companies, for the purposes of this case, and as applied to the general territory involved, comprises the "Bell system." This system first occupied the telephone field, both local and long distance. Opposition companies appeared competing at first through local exchange for local service, to which was added in due time toll service to nearby exchanges.

The opposition companies were usually denominated "independents," although there was usually no connection except as they were in general opposition to the Bell system.

In the year 1898 the United States Telephone Company was incorporated under the laws of Ohio as a long distance company, and intended by its promoters to meet the needs and demands

of the various so-called "independent" local companies. It obtained various similar ninety-nine year contracts from local telephone companies, upon the faith of which capital was invested in the construction of metallic circuits and other improved equipment and the extension of long distance service. The zone of influence of the United States companies comprises chiefly the state of Ohio, portions of Indiana, Michigan, Illinois, with limited service to points beyond. The service of the United States company is distributed to the public through local exchanges and pay station booths. The alliance of the United States and the various local companies through the operating contracts was, within the zone of its influence, in a general sense a rival and competitor of the Bell system.

The Middlepoint Home Telephone Company succeeded to the properties and rights of the Middlepoint Telephone Company and the Middlepoint Southern Telephone Company. Each of the former companies were in the independent system and under ninety-nine year contracts with the United States company. Upon succeeding to the rights and properties of its predecessor companies the prior contracts were abandoned or superseded by the contract of September 2d, 1904, entered into by the defendant company.

The main provisions of the existing contract are as follows:

"The second party (the Middlepoint company) * * * agrees to transmit all business to points not now reached by it or its own line or lines of the first party (except in Van Wert county).

"The first party (the United States company) agrees to transmit all messages destined to points on the lines of the second party, not reached by its own system of wires to and over the lines owned or controlled by said second party lying within Van Wert county, Ohio.

"Said parties agree not to enter into any contract with any other person. firm, or corporation whereby any of the rights, privileges, or advantages herein acquired by either party may be impaired.

"Each party hereto agrees to receive from the other all messages destined to points within its charter or connecting lines which may be delivered to it by the other party hereto,

"As to all messages received by the Middlepoint company and transmitted over the lines of the United States company the Middlepoint company shall receive twenty-five per cent. of the toll charges, and the United States company the balance, provided the Middlepoint company shall in no case receive more than 12½ cents for any message.

"This contract shall be in force for a period of ninety-nine years from the date hereof."

Pursuant to this and the preceding contracts the United States company constructed and has maintained long distance connections with the defendant's exchange and has furnished long distance service with interchange of business.

The Middlepoint company, in order to secure service to points and exchanges not reached by the United States company and better long distance service to points within the territory of the United States company, contracted on November 29th, 1907, with the Central Union company for a connection of the wires of the Central Union company with the exchanges and subscribers of the Middlepoint company and a designation of the former company as toll agent of the latter at a specific per centum compensation. The stipulated connections were made December 23d, 1907, and maintained for long distance service and the routing of business until February 23d, 1908, when terminated by the restraining order of the common pleas court.

There is considerable testimony as to imperfect and inferior service at different points over the lines of the United States company and its connections. But we think that the nature of this service is not of such a character as to materially differ from that contemplated by the contract with the United States company, nor has the proper foundation been laid for a termination of the contract upon that ground. The case rests upon the validity of the ninety-nine year contract. Independent of the obligations of the contract there is no doubt of the right of the Middlepoint company to maintain connections with and obtain the advantages of both companies. The Middlepoint company, therefore, is only restrained. if at all, by virtue of the obligations of its contract.

The Middlepoint company contends that the dual connections and long distance service afforded thereby greatly ex-

tends and improves the service to its patrons and facilitates thereby the public necessity represented by its charter and the duties it has assumed. It therefore justifies its violation of the exclusive and non-impairment covenant of its contract with the United States company upon the ground that such stipulations are *ultra vires* and opposed to public policy.

Section 3455, Revised Statutes, among other provisions authorizes a telephone company in respect to other lines to "join with any other company or association in conducting, leasing, owning, using or maintaining such line or lines upon such terms as may be agreed upon."

This authority is sufficiently comprehensive to uphold an operating contract between telephone companies based upon mutual exchange of business. The terms "using" and "maintaining" so employed are not without significance and application in the present case. To "use" another telegraph or telephone line includes the necessary physical connection and operating control for a limited time. To "maintain" another line may reasonably and fairly include not only the physical agencies necessary in operation, but may be extended to the guaranteeing or furnishing of business.

It is, however, contended by the Middlepoint company, and in our opinion correctly, that the letter of the statute conferring charter power is not the absolute test of *ultra vires*. The well established rules of public policy as reflected in the trend of decided cases and statutes *in pari materia* will often be engrafted as exceptions upon a general grant of power by the charter act. The special provisions of the enabling act may, however, reflect a legislative intent upon the subject of public policy, and if so, must be applied, although in some measure modifying the pre-existing rules.

But mere general phraseology should not be held to overturn or subvert long continued and well settled rules of public policy.

Assuming then that the contract under consideration is within the letter of the statute, we proceed to the consideration whether it is obnoxious to the established rules of public policy.

It is not without importance to note that the suit here is between the contracting parties, one seeking to sustain and the other to avoid the contract. No better statement can be given of the underlying principle upon which the jurisdiction rests in cases of this kind than that by Chief Justice Wilmot in *Low* v. *Peers*, cited in *Crawford* v. *Wick*, 18 O. S., 203:

"It is the duty of all courts of justice to keep their eyes steadily upon the interests of the public even in the administration of commutative justice, and when they find an action is founded upon a claim injurious to the public, and which has a bad tendency, to give it no countenance or assistance *in foro civili.*"

The contract under consideration is attacked upon the ground (1) that it is in restraint of trade and tends to stifle and restrict competition, and (2) that it disables the contracting public service corporations in respect to certain public duties made incumbent by the charter and regulating acts.

In the consideration of the principles of public policy as affecting the validity of contracts the courts do not proceed upon abstract theory, nor allow themselves to be controlled by a narrow view of the terms employed. To vitiate a contract in such case the public welfare in a practical sense must be injuriously affected either in fact or in logical and natural tendency.

This doctrine finds support in the opinion of Mr. Justice Harlan in the recent case of *the Continental Wall Paper Co.* v. *Voight & Sons Company*, 212 U. S., 266, as follows:

"The adjudicated cases all hold that upon the question whether the particular contract sought to be enforced arises out of an illegal transaction the courts will not be restricted to a partial statement of the facts, but the court will consider all the circumstances connected with the transaction so as to ascertain its real nature."

To the same effect are, *Whitwell* v. *The Continental Tobacco Company*, 125 Fed., 460, and *Philips* v. *Iola Cement Co.*, 125 Fed., 593.

It is, therefore, clear that the provisions of the contract between the telephone companies must be considered in the light of

surrounding facts, its real scope, purpose and logical tendency as affecting the public interest.

It can hardly be doubted that at the time of its execution, and in view of the existing situation, the contract was not only beneficial to the contracting parties, but conducive to the public interest. It gave to each company a needed service and a mutual exchange of business. The Middlepoint company secured the advantages of the highway of the United States company for long distance service for a long term of years, and of the interchange of business.

The contract in no wise affected the service of the Bell companies in their usual mode and through their chosen agencies, nor as applied to existing conditions did it tend to stifle or suppress competition. On the contrary, from a practical and business standpoint competition was thereby promoted and made more effective. Any other view sacrifices substance to mere shadow and practical judgment to abstract theory.

It must be kept in mind that the combining companies here were substantially and practically non-competitive, and herein is found the distinction between the case at bar and many of those cited.

The salt company case (35 O. S., 666) and the Standard Oil Company case (49 O. S., 137) were combinations of competing companies to control prices and production. The prices had not in fact been raised, but the legitimate tendency of the control was to artificial increase of prices. The court was not, therefore, content to accept as conclusive the one fact that prices were for the time being lowered. but took the broad view that the suppression of full competition and artificial control of prices by parties whose interests and cupidity might suggest increase had an evil tendency and should not be upheld.

Taking the lead from these cases, we are asked to accept as conclusive a partial statement to the effect that some individual patrons of the local company may be deprived of the extended service of the Bell company and to ignore the general conveniences arising from effective competition.

*Scofield* v. *Railway Company*, 43 O. S., 571, holds that a contract making concessions in rates to a larger shipper is an un-

lawful discrimination tending to create monopoly, and injure, if not destroy, the business of the small shipper, and therefore opposed to public policy.

The Fringelli case, 57 O. S., 576, adheres to and defends the common law rule sustaining contracts in partial restraint of trade as incidental to the sale of a business and good will, but holding those in general restraint of trade invalid. None of these cases, in our view, apply to combinations between non-competing companies, where the legitimate effect and natural tendency is to strengthen their efficiency in a field of competition. The combination of non-competitive telephone companies for extension of service is brought within the general policy of the law by Section 3455, Revised Statutes, and should be upheld unless there appears some injurious feature not contemplated by the statute.

It is urged that the combination by ninety-nine year contracts between the United States company and a large number of local companies threatens monopoly as offensive as that charged against the Bell system, and ought not as a matter of public policy be sustained. It is not claimed, however, that all this might not be done by consolidation, purchase or lease, and we can not perceive why it may not also be done by operating contracts. Should the combination ever reach the stage of monopoly by crushing out its powerful rival, or by combining with it, we do not doubt the power of the courts to afford a remedy and protect the public. But we can not bring ourselves to the conclusion that it should be condemned while engaged in the struggle of competition upon remote possibilities.

We quote from Mr. Chief Justice Fuller upon somewhat similar contentions in *the U. P. Ry. Co.* v. *Chicago, etc., Ry. Co.,* 163 U. S., 569:

"It will not do to hold this contract void and allow defendant to escape from the obligation it assumed on the mere suggestion that at some time in the remote future there is a possibility that the suggested contingency might arise. Should it happen, however, the courts are competent to relieve from the consequences of so radical a change of condition."

It is, however, contended that the exclusive character of the contract and its long time are features rendering it obnoxious to public policy.

In the case of *Rd. Co.* v. *Himrod Furnace Co.*, 37 O. S., 321, the furnace company had an exclusive contract with the railroad company for dockage and transportation of all its ore supplies for a period of ten years. The railroad company after a time sought to be relieved upon the ground that the contract was inconsistent with its duty to the public and necessarily discriminatory. The court declined this view and held the contract for the term of years valid. Johnson, J., in the opinion makes this observation:

"Neither the state, nor the public, who are benefitted by this public highway are complaining. Why should the corporation be allowed to absolve itself from a contract fairly made, of mutual obligation and advantage when made, supported by a valuable consideration received in great part and free from any discrimination, simply because it may prove less profitable than was anticipated."

These observations are more or less pertinent here. The Middlepoint company and its predecessors to whose property and rights it succeeds sought or at least accepted the contracts and obtained the benefits. It not only gave but received exclusive rights. Without the advantages the contract gave, the Middlepoint company would not in all probability have attracted the notice of the Bell company nor have been able to secure connection with that system.

The language of Mr. Justice Brewer on the circuit quoted in the celebrated case of *the Union Pacific Ry. Co.* v. *the Chicago, etc., Ry. Co., supra,* is appropriate:

"It is to the higher interests of all corporations and public alike that it be understood that there is a binding force in all contract obligations; that no change of interest or change of management can disturb their sanctity or break their force, but that the law which gives to corporations their rights, their capacities for large accumulations and all their faculties is potent to hold them to all their obligations so as to make right and justice the measure of all corporations as well as individual action."

Similar views are announced in an able opinion by Wilson, J., in the case of *the D. & U. Railroad Co.* v. *the P., C., C. & St. L. Ry. Co.,* 6 C. C. (N.S.), 537 (affirmed, 67 O. S., 532).

The case of the Middlepoint company to annul its contract and be relieved therefrom appeals to the chancellor of a court of equity only by being cloaked in consideration of the public welfare.

It is argued that it was the charter right of the Middlepoint company to extend its service to long distance and *vice versa* as to the United States company, and that the exclusive contract disabled each from furnishing such added service. But the right extended by Section 3455, Revised Statutes, to extend lines without charter amendment must be read and harmonized with other express provisions of the charter law authorizing consolidation, leasing and operating contracts. The Middlepoint company, therefore, had its option to extend its lines by construction, purchase, lease, or by operating contract. Any of the modes answer the charter duty. *Michigan Central Railway Co.* v. *the Pere Marquette Railway Co.,* 128 Mich., 333; *the U. P. Railroad Co.* v. *Chicago, etc., Ry. Co., supra.*

Again it is urged that the exclusive and non-impairment covenants of the contract disables the Middlepoint company from obtaining for its patrons the choice of routes and added service afforded by the dual connection. The question so urged is not free from doubt and is the subject of conflicting decisions. Closely allied to this question is also that of discrimination in service as applied to telephone exchanges. The validity of exclusive contracts depends upon the extent to which proprietory rights are enforced in cases of public service corporations. By assuming public duties the corporation yields a portion of its proprietory dominion over its business and becomes liable to certain mandatory duties, among others to serve the public without discrimination.

The case of *State, ex rel,* v. *Telephone Co.,* 36 O. S., 296, holds telephone companies to the duty of indiscriminate service to the public. This case arose upon the refusal of the telephone company to install an instrument in the office of a railway company

having a telegraph department. The refusal was based upon the ground that the telephone company had an exclusive contract with another telegraph company and refused the railroad company its service because it had charge of a telegraph department. But it will be observed that the railroad company sought this service as one of the public. Its application and the service demanded was no different from that afforded other members of the public. The objection of the telephone company was purely personal. The applicant was a competitor of a patron of the telephone company holding an exclusive contract. The refusal of the telephone company was therefore a discrimination among the public whom the telephone company had engaged to serve indiscriminately.

But this rule of indiscriminate service applies only to the public. It does not apply as between public service companies desiring physical connection of plants or joint use of facilities. There is a marked distinction between primary service to the public of a public service company by its own facilities, and secondary service by yielding up its facilities and equipment to another public corporation to facilitate the latter's service.

The primary service is guaranteed by law, while the secondary service in the absence of further legislation can only be secured by contract. *U. P. Ry. Co.* v. *Chicago, etc., Ry. Co., supra*; *Wayne-Monroe Tel. Co.* v. *Ontario Tel. Co.*, 112 N. Y. S., 424; *Yazoo Ry. Co.* v. *Searls* (Miss.), 68 L. R. A., 715.

The Pullman car, express and stock yard ceses are in our opinion directly in point. *St. Louis, etc., Ry. Co.* v. *Southern Express Co.*, 117 U. S., 1; *A. F. & S. F. R. R. Co.* v. *Denver, etc., Ry. Co.*, 110 U. S., 607; *L. & N. R. R. Co.* v, *West Coast Naval Stores*, 198 U. S. 483; *Central Stock Yards* v. *L. & N. R. R. Co.*, 192 U. S., 568; *So. Pacific Co.* v. *Interstate Comm. Com.*, 200 U. S., 536; *Chicago, etc., Ry. Co.* v. *Pullman Co.*, 139 U. S., 79; *Ft. Worth, etc., Ry. Co.* v. *Texas* (Tex.), 70 L. R. A., 950.

Strong argument might be offered showing the advantage to the traveling public in having interchange of Pullman car service with connecting railroad companies; and so also it might be

argued that the connection of train service upon different lines and the joint use of terminal facilities in the populous cities and commercial centers might greatly enhance public convenience. But it is universally held that such interchange of facilities are subject only to contract and can not be enforced as mandatory or legal duties.

A careful study of the "Union Depot" cases may reflect some light in the present consideration.

In *State, ex rel,* v. *the Union Depot Company,* 71 O. S., 379, an exclusive grant of cab privileges upon depot grounds was sustained. The only exception allowed was the right of passengers to arrive or depart in owned or hired conveyances. This right of the passengers was one of ingress and egress following as an incident from the transportation.

In the opinion by Crew, J., the rule of discrimination, that the railway company having admitted one cab company, must admit all, announced and maintained in the states of Indiana, Michigan, Missouri, Montana, Kentucky and New Hampshire, is disapproved, while that of the states of New York, Massachusetts, Connecticut, Georgia, Minnesota, Virginia, Rhode Island, and the Federal courts sustaining exclusive contracts, is approved. The case of *Donovan* v. *Pennsylvania Company,* 120 Fed. Rep., 215, cited with approval, contains this statement of the rule:

"The fact that the person who asserts the right to carry on his business for his own profit upon the trains or within the station buildings is himself a common carrier, does not affect the question. The railroad company is a common carrier of merchandise, but is not a common carrier of common carriers of merchandise. It owes no duty to express companies to haul their cars and safes and messengers. * * * If it owed the duty it would have to treat all alike. Owing no duty it may engage or not as it pleases in the business of serving express companies and many choose the company and name the terms acceptable to it."

In affirming the Donovan case (199 U. S., 279) Mr. Justice Harlan, speaking of the exclusive contract, says:

"The railroad company was not bound to accord this particular privilege to the defendant simply because it had accorded

a like privilege to the Parmelee Transfer Company, for it had no contractual relations with the defendant and owed them, as hackman, no duty to aid them in their special calling.''

See, also, *State, ex rel Cairo Tel. Co.* v. *Western Union Tel. Co.*, 166 Ill., 15; *Wayne-Monroe Tel. Co.* v. *Ontario Tel. Co., supra; People, ex rel,* v. *Hudson R. Tel. Co.*, 29 Abb. N. C., 478; *Central New York Tel. & Tel. Co.* v. *Averill*, 129 App. Div., 752.

.In *State, ex rel,* v. *Cadwallader* (Ind.), 87 N. E., 644, there is an interesting and able opinion by Meyers, J., holding the telephone company, like railway and other public service corporations, can not be compelled to furnish through service for another service company by physical connection of plants. But following the Indiana doctrine as established in the ''depot'' cases, held that having opened its exchange to one long distance company, it was bound to afford equal service to all.

This opinion of Anderson, J., of the federal court in *Roland, etc.,* v. ———, also follows the local doctrine of the state of Indiana.

It is, however, contended that Section 3462, Revised Statutes, requiring interchange of despatches between telegraph companies, made applicable to telephone companies by Section 3471, Revised Statutes, from the nature of the telephone business extends to physical connection and joint use of wires and apparatus.

Section 3462, Revised Statutes, prescribes the mandatory duties imposed by law. This section must be read with Section 3455 prescribing the powers of voluntary contract. The former includes as a mandatory duty the interchange of despatches while the latter includes as a right to be obtained by contract the ''use'' of other lines.

Section 3462 as applied to telegraph companies does not contemplate physical connection and joint use of wires, and a more extended construction ought not to be applied to telephone companies. Despatches may be transmitted by telephone as by telegraph. But the use of through wires is not contemplated by the statute as to either telephone or telegraph lines. To discriminate and hold that telegraph despatches are only required to be de-

livered from one line to another in relay, while telephone despatches comprehend verbal messages to be carried through by the physical connection and joint use of different lines can not reasonably be sustained.

We have examined with much care the case of *the U. S. Telephone Co.* v. *the C. U. Telephone Co.*, 171 Fed., 130, and regret our inability to agree with the learned judge, for whose opinion we have great respect and from whose conclusion we hesitate to dissent. The following proposition is laid down in the syllabus:

"Conceding that a local company is not bound to permit any long distance connection of its exchange, yet, when it extends that right to one company, it is under legal duty as a public service corporation to extend the same rights to others."

We are unable to reconcile this proposition of the syllabus and the portion of the opinion supporting it with the rule laid down in the Union Depot case in this state.

It is urged that large public conveniences, with slight inconvenience to the telephone company, would flow from joint connection and joint use of wires; but this argument should be more properly addressed to the General Assembly upon the subject of amending the sections of the statute referred to by taking the subject of joint use of lines from the contract section and adding it to the list of mandatory duties. The stipulations as to rates and territory are urged as affecting the validity of the contract. But in our view the rates can not, under the contract, be fixed arbitrarily by the United States company. They must be reasonable, as in case of any other contract not express as to rates. The contracts between the former telephone companies and the United States company are not before the court for adjudication. They have been superseded, and there is no question of good faith between present contracting parties raised.

The exception as to Van Wert county and the provision as to division of business at certain points with other independent companies are fairly incidental to the contract and do not violate any principle of public policy.

It is contended, however, that the toll service connection with the Van Wert exchange and the exception of Van Wert county from the contract creates a non-competitive zone for toll service for long distance business. We are of the opinion, however, that the Van Wert toll extension and the reservation of a wider local area does not of necessity constitute the U. S. and the Middlepoint companies competitive.

Objection is taken to the remedy by injunction. This objection is argued with much force and has the sanction of the learned judge in the case of *the U. S. Telephone Co.* v. *the C. U. Telephone Co., supra.* The case of *the Union Pacific Ry. Co.* v. *Chicago, etc., Ry. Co., supra,* is explicit in support of the jurisdiction here invoked, and we feel bound to follow that authority. The authority of *Steinau* v. *the Gas Co.,* 48 O. S., 324, is to the effect that a general order of specific performance should not be granted where it involves a general and continued oversight of an intricate business. This authority restrains the court from the issuing of such a general order as would amount in effect to specific performance of this contract throughout the length of its existence, but does not prevent the court from granting an injunction from the commission of certain specific acts now threatened. This evidently was the view of the court in *the D. & U. Railroad Co.* v. *P., C., C. & St. L. Ry. Co.,* although the point does not appear to have been raised in the case.

Upon the subject of parties the case is not identical with that before Judge Taylor. There the injunction was sought against the intermeddling company; here the relief is sought against the party making the original contract and now attempting to avoid it. It is sufficient that the contracting party be before the court, and it is not necessary, in our opinion, to go further and add those who contemplate making impairing contracts.

The existing contract between the two telephone companies in this case does not by express terms or by necessary inference prevent the Middlepoint company from securing an extension of its service through a company other than the United States company to points not within the territory of the latter company, so long as in not doing so it does not impair the existing contract.

We do not, therefore, decide the effect of such a contract where the connection is made and the scope of the contract is such as not to amount to an impairment of the contract under consideration. The present contract of the Central Union company applies to all business with the Middlepoint company or any subscriber of the Middlepoint company who desires to send over the lines of the Central Union, and contains an explicit stipulation that the Middlepoint company will make connection between the lines of the subscribers to its exchange or exchanges and the toll lines of the Central Union company, so that the contract is directly an impairment of the existing contract with the United States company. This is confirmed amply by the testimony showing that during the two months the Central Union toll contract was in existence, substantially all the business routed over the Central Union lines was business that would under the contract have been entitled to go over the United States lines.

It follows, therefore, that an injunction should be made perpetual against the defendant company from making the connections with the Central Union company under the present contract, and from routing business over that company to points within the territory reached by the United States company lines.


KINDER, J., dissenting.

I am unable to give assent to the reasoning, or concur in the judgment in this case.

I am content with the statement of the case contained in the majority opinion, except that it omits the fact that the Middlepoint Telephone Company and Middlepoint Southern Telephone Company were, at the time of the contracts made by the United States Telephone Company with each, engaged in transacting a long distance or toll service business, limited, however, to a few points outside of Van Wert county, and the assumption that the contracts with these two companies were abandoned or superseded by the contract made with the Middlepoint Home Telephone Company seems to be unwarranted; for it is insisted by the plaintiff in this case that the contracts referred to which are

pled in the petition and introduced in evidence are still in force and binding upon the Middlepoint Home Telephone Company and are now effective to fix and determine the rights of the parties to this action. The assumption that the contracts under consideration, including the exclusive and restrictive provisions thereof, are within the letter of Section 3455 of the Revised Statutes, is in my judgment unwarranted either by the phraseology of that section or by the history of the legislation of which that section forms a part. It is important to note and remember that a telephone company in this state may construct, own, use and maintain any telephone lines, whether the same are provided for specifically in its charter or not, and whether such lines are wholly within or partly beyond the limits of this state; hence the fact that the plaintiff is chartered as a long distance or toll line company and the defendant as a so-called local telephone company, upon which some stress is laid in the majority opinion, is of little moment and certainly not a controlling factor in the case. There was in fact limited competition between these companies when the contracts "A" and "B" were entered into which was withdrawn and these contracts with contract "C" are relied upon to prevent competition either by the present arrangement with the Bell company or by the construction or lease of other lines, for *all* messages are required to be sent over the lines of the plaintiff company.

I dissent from the judgment in this case:

First. Because the contracts set out in the petition in so far as the exclusive and restrictive provisions are concerned tend to prevent competition, are in restraint of trade and are therefore void as against the public policy of the state as declared by legislative enactment and the decisions of our Supreme Court extending from its earliest history to the present time, and I deny that the depot case in the 71st Ohio State forms any exception to or makes any modification of the uniform course of the decisions of our court of last resort. The majority opinion is based upon the assumed fact that the first result of the entering into of the contracts under consideration and a large number of contracts of like effect by the United States Telephone Company with so-called local companies has been to furnish competition to

the Bell system, but realizing the general tendency of such con-
tracts suggests that, "should the combination ever reach the stage
of monopoly by crushing out its powerful rival or by combining
with it, we do not doubt the power of the court to afford a rem-
edy and protect the public, but we can not bring ourselves to the
conclusion that it should be condemned while engaged in the
struggle of competition upon remote possibilities." I do not
understand the public policy of the state to be that it will permit
and recognize the validity of contracts so long as their results
are favorable and declare them invalid and void only after harm-
ful results have accrued, but that the policy of the state is to
test the contracts by their *tendency* to restrain trade and so to
monopoly and by declaring such as are obnoxious void to make
impossible the creation of a monopoly dangerous to the state and
harmful to its citizens.

Second. I deny the right of a public service corporation or-
ganized under the laws of this state by contract to bargain away
its power to serve, or to absolve-itself from the duty of serving,
the public to the full measure of the public need, and the public
policy of the state requires such a corporation to be free to meet
the conditions as they change from time to time.

Third. The statute which gives to telephone companies the
rights and benefits conferred by the chapter relating to mag-
netic telegraph companies subjects them to the same burdens
placed upon such companies and among others the duty to
forward messages. This duty in my judgment is not met by re-
ceiving the human voice over one line and by sending it by an-
other human voice over another line; it is met only by an oppor-
tunity for conversation by a direct communication between two
persons, as contemplated by the telephone, and I am therefore
strongly of the opinion that for the purposes of carrying out the
provisions of this statute one telephone company can compel a
physical connection with another. But it is not necessary to
go to this extent in this case, for it must be remembered that
when this action was begun and for two months prior thereto
a physical connection had been made between the Bell Company
and the Middlepoint Home Telephone Company and these two
companies were forwarding messages each for the other in strict

compliance with the requirements of the statute, and the decree in this case will operate to prevent two willing companies from performing a duty enjoined upon them by law.

Fourth.  The contracts in this case in their exclusive and restrictive provisions apply only to business and points which can be reached over the United States Telephone Company, but the decree in this case prevents physical connection of any kind and thereby deprives the Middlepoint Home Telephone Company from arranging for the benefit of its subscribers, for messages to points not reached by the United States Telephone Company. Clearly even if the contracts under consideration are valid and enforcible they should not be enforced beyond the letter of the contract and certainly not beyond what is essential to the protection of the company seeking the enforcement of the contracts.